**SMITHKLINE CORPORATION,**
Plaintiff,

v.

**Elmer B. STAATS, Comptroller General of the United States, Defendant,**

and

**The United States of America, Intervenor-Defendant.**

Civ. A. No. 75–499.

United States District Court, E. D. Pennsylvania.

Jan. 24, 1980.

William S. Rawls, Philadelphia, Pa., for plaintiff.

Peter F. Vaira, U. S. Atty., Philadelphia, Pa., for defendant.

J. Roger Edgar, Dept. of Justice, Civil Division, Washington, D. C., for intervenor-defendant.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

This action arises from a demand asserted by the General Accounting Office ("GAO") for access to books and records maintained by the plaintiff SmithKline Corporation ("SmithKline"). Plaintiff filed a complaint seeking declaratory and injunctive relief to bar GAO from access to the documents. The Court granted the motion of the United States to intervene as a party defendant for the purpose of asserting a counterclaim seeking declaratory and injunctive relief to compel SmithKline to comply with GAO's demand for documents. Now before the Court are plaintiff's motion for summary judgment and the government's motion for

summary judgment on its counterclaim. For the reasons hereinafter set forth, the Court will grant the government's motion for summary judgment on its counterclaim and deny the plaintiff's motion for summary judgment.

■ In determining the propriety of granting a motion for summary judgment, the Court must consider whether there exists a genuine issue as to any material fact. *Hicks v. ABT Associates, Inc.*, 572 F.2d 960, 967 (3d Cir. 1978); *Abdallah v. Caribbean Security Agency*, 557 F.2d 61, 63 (3d Cir. 1977); *Scott v. Plante*, 532 F.2d 939, 945 (3d Cir. 1976). On the basis of uncontroverted depositions and affidavits filed by the parties in connection with the motions for summary judgment, the Court finds that there is no genuine issue of material fact. The uncontroverted record may be summarized as follows:

The Veterans Administration ("VA") and Defense Supply Agency ("DSA") awarded certain negotiated fixed-price contracts for pharmaceutical products to SmithKline, and, in one instance, to SK&F Co., its wholly owned subsidiary. Those contracts are summarized as follows:

Veterans Administration

| Contract Number | Date of Award | Contract Price | Final Payment Made |
|---|---|---|---|
| V797P–5835b | 7/31/73 | Est. $1,599,042.50 | ---- |
| V797P–5892b | 10/2/73 | $ 137,148.00 | ---- |

Defense Supply Agency

| DSA120–74–C–0519 | 8/1/73 | $ 105,431.74 | 12/26/73 |
| DSA120–73–D–2968 | 4/16/73 | $1,436,510.30 | 8/22/74 |
| DSA120–74–C–2518 | 3/6/74 | $ 12,058.20 | 8/13/74 |

Pursuant to 41 U.S.C. § 254(c),[1] the contracts with the VA incorporated the following clause:

EXAMINATION OF RECORDS BY COMPTROLLER GENERAL

(a) This clause is applicable if the amount of this contract exceeds $2,500 and was entered into by means of negotiations, including small business restricted advertising, but is not applicable if this contract was entered into by means of formal advertising.

(b) The Contractor agrees that the Comptroller General of the United States or any of his duly authorized representatives shall, until the expiration of 3 years after final payment under this contract or such lesser time specified in either Appendix M of the Armed Services Procurement Regulation or the Procurement Regulations Part 1–20, as appropriate, have access to and the right to examine any directly pertinent books, documents, papers, and records, of the contractor involving transactions related to this contract.

(c) The Contractor further agrees to include in all his subcontracts hereunder a provision to the effect that the subcontractor agrees that the Comptroller General of the United States or any of his duly authorized representatives shall, until the expiration of 3 years after final payment under the subcontract or such lesser time specified in either Appendix

1. 41 U.S.C. § 254(c) provides:
    (c) All contracts negotiated without advertising pursuant to authority contained in this Act shall include a clause to the effect that the Comptroller General of the United States or any of his duly authorized representatives shall until the expiration of three years after final payment have access to and the right to examine any directly pertinent books, documents, papers, and records of the contractor or any of his subcontractors engaged in the performance of and involving transactions related to such contracts or subcontracts. . . .

M of the Armed Services Procurement Regulation or the Federal Procurement Regulation Part 1–20, as appropriate, have access to and the right to examine any directly pertinent books, documents, papers and records of such subcontractor, involving transactions related to the subcontract. The term "subcontract" as used in this clause excludes (1) purchase orders not exceeding $2,500 and (2) subcontracts or purchase orders for public utility services at rates established for uniform applicability to the general public.

(d) The periods of access and examination described in (b) and (c), above, for records which relate to (1) appeals under the 'Disputes' clause of this contract, (2) litigation or the settlement of claims arising out of the performance of this contract, (3) costs and expenses of this contract, as to which exception has been taken by the Comptroller General or any of his duly authorized representatives, shall continue until such appeals, litigation, claims or exceptions have been disposed of.

The same clause was included in the Defense Supply Agency contracts, pursuant to 10 U.S.C. § 2313(b), which provides:

(b) Except as provided in subsection (c), each contract negotiated under this chapter shall provide that the Comptroller General and his representatives are entitled, until the expiration of three years after final payment, to examine any books, documents, papers, or records of the contractor, or any of his subcontractors, that directly pertain to, and involve transactions relating to, the contract or subcontract.

On January 19, 1971, Comptroller General Elmer B. Staats and other GAO representatives appeared before the Subcommittee on Monopoly of the Senate Select Committee on Small Business at hearings concerning the status of competition in the pharmaceutical industry. Mr. Paul Shnitzer of the GAO General Counsel's Office testified that

. . . there is a statute which was enacted in 1951 which says in effect that any negotiated contract awarded pursuant to either the Federal Property Act or the Armed Services Procurement Act, which would cover the two major acts, has to contain a provision which gives the General Accounting Office access to the books, documents, papers and records of the contractor or his subcontractors which relate to the contract.[2]

Mr. Gregory Ahart, Deputy Director of GAO's Civil Division, testified that

. . . we are continuing our work in examining drug procurement systems and as part of that work we will be giving consideration to utilizing the authority which we have under the provision of the 1951 act which Mr. Shnitzer mentioned, and actually examine the costs of certain of the drug manufacturers.

We have not decided how far we are going to go on this and the final plans are indefinite, but this will be given consideration as part of this continuing work and I am sure some of it will be done.[3]

Senator Gaylord Nelson then stated:

I realize it may be a very complicated matter, but it would seem to me that all companies ought to be served notice and the GAO is going to utilize this statute. I think that we ought to take a look at some of those costs.[4]

After the hearings, Senator Nelson and his staff pursued their efforts to have GAO obtain documents from the pharmaceutical companies. On August 9, 1971, the Comptroller General asked Senator Nelson and his staff assistant, Ben Gordon, if their objectives would be served by composite, industry-wide cost data that would be representative of several companies and products, but not identifiable as to any particular company or product. Gordon responded that they preferred individual product and

---

2. Subcommittee on Monopoly of the Senate Select Committee on Small Business, Hearings on Competitive Problems in the Drug Industry, January 19, 1971, at 8018.

3. *Id.* at 8020.

4. *Id.*

company data, which "should be made public."[5] Gordon continued to press GAO to obtain documentation of costs from the pharmaceutical companies. (Ahart Dep., Exhibits PA–14 through PA–22). Gordon demanded on behalf of Senator Nelson that GAO seek data "through the courts, if necessary." (*Id.,* Exhibits PA–16, PA–17). Gordon told GAO that Senator Nelson believed that GAO should seek data "without any strings attached" so that the information "could be used as needed." (*Id.,* Exhibit PA–19). A staff assistant to Senator Edward Kennedy told GAO that individual company and product data were essential, since the "only way" that Senator Kennedy's objectives could be achieved was to "publicize specific price and cost data for individual products." (*Id.,* Exhibit PA–27).

As a result of these communications, GAO eventually concluded that ". . . there is no viable alternative than to press the companies for access to their cost data." (*Id.,* Exhibit PA–18).

Subsequent to a second appearance by the Comptroller General before Senator Nelson's Subcommittee on May 10, 1972, GAO began to implement a two-phase study of the economics and operations of the pharmaceutical industry. As a first step, GAO representatives met with representatives of the Pharmaceutical Manufacturers Association and its member firms.[6] The first phase of the study consisted of two or three day visits to the facilities of six drug manufacturers, including SmithKline. Phase I of the study, in which the drug manufacturers voluntarily agreed to participate, was "designed to obtain for GAO an understanding of the drug manufacturing industry and to enable GAO to develop a meaningful approach for the second phase of the study." (Ahart Aff. I ¶ 6).

Following the Phase I visits, GAO prepared a proposed plan for a detailed study (Phase II). The objective of this study was "to gather and develop data necessary for GAO to present a comprehensive and objective presentation to the Congress and the involved Federal agencies concerning the salient economic and operational aspects of the drug industry." (Ahart Aff. I ¶ 8). It was proposed that GAO request that major drug manufacturers provide data for the years 1964 through 1973 relating to sales, manufacturing cost, research and development expenditures, general and administrative expenses, marketing costs, distribution costs, capital investment, and all other costs associated with the pharmaceutical business. (Ahart Dep., Exhibit PA–10). Senators Kennedy and Nelson continued to insist that the study provide cost data specific to individual products and companies. (Ahart Dep. Exhibits PA–27, PA–29).

Beginning in March, 1974, GAO held discussions with the six pharmaceutical firms concerning their willingness to participate in the Phase II plan. By June, 1974, it became clear that the firms would not voluntarily permit access to the data sought by GAO. (Ahart Aff. I ¶ 9). GAO therefore dropped its plans for the voluntary Phase II study and decided upon "a more modest study" which would be based on data obtained through access-to-record provisions in negotiated government contracts with drug companies. (*Id.* ¶ 10). GAO has described the purpose of this study as follows:

> GAO intends to use data obtained through the access-to-records clause contained in the specified contracts in a proposed review to determine the basis for the prices charged by the suppliers of the products procured by the Government under the specified contracts. In undertaking this review GAO intends to: (1) iden-

---

**5.** Deposition of Gregory J. Ahart, Director GAO Human Resources Division, October 19, 1976 (hereinafter "Ahart Dep."), Exhibit PA–15. Mr. Ahart's deposition was taken in the case of *Merck & Co. v. Staats,* No. 74–1447 (D.D.C.), but the parties stipulated that the deposition transcript may be used in this action as if the deposition had been taken in this case. Exhib-

its to the deposition are referred to as "Exhibit PA", with an identifying number. Copies of the exhibits and deposition transcript have been filed of record.

**6.** Affidavit of Gregory J. Ahart, July 8, 1975 (hereinafter "Ahart Aff. I") ¶ 5.

tity and verify the direct costs involved in the manufacture and distribution of these particular products (2) identity the make-up and amounts of indirect costs involved in the development, manufacture, distribution, and marketing of these products and (3) review other pertinent considerations taken into account by the suppliers in pricing these products.

(Ahart Aff. I ¶ 11).

On August 26, 1974, the Comptroller General wrote to the President of SmithKline:

As you know, because of the increasing Federal involvement in the procurement of pharmaceuticals, the General Accounting Office has underway a review of the procurement of drugs by agencies of the Federal Government, including the pricing of drugs and pharmaceuticals procured under negotiated contracts. This examination is being conducted at several drug companies, including SmithKline Corporation, and is being made pursuant to the Budget and Accounting Act, 1921 (31 U.S.C. § 53), the Accounting and Auditing Act of 1950 (31 U.S.C. § 67), and the authority of the Comptroller General to examine contractors' records under the contract provisions pursuant to 10 U.S.C. § 2313(b) and 41 U.S.C. § 254(c).

.     .     .     .     .

The purpose of this letter is to formally request that cost records pertinent to contracts listed on enclosure 1 be made available for our examination as provided by the terms of the negotiated contracts awarded to your company by the Defense Supply Agency and the Veterans Administration. We must request that you have the responsible officials at Smith-Kline Corporation make available to the General Accounting Office as required, all books, documents, papers, and other records directly pertinent to the contracts, *which include, but are not limited to* (1) records of experienced costs including costs of direct materials, direct labor, overhead, and other pertinent corporate costs, (2) support for prices charged to the Government, and (3) such other information as may be necessary for use to re-

view the reasonableness of the contract prices and the adequacy of the protection afforded the Government's interests. For your information, statements from the legislative history pertaining to the "Examination of Records" clause included in the contracts and our position on the duties and responsibilities that the clause imposes upon my Office are presented in enclosure 2.

SmithKline refused to comply with this formal request for records, and filed its complaint seeking declaratory and injunctive relief on February 20, 1975.

SmithKline does not question the government's authority, pursuant to 41 U.S.C. § 254(c) and 10 U.S.C. § 2313(b), to include in its negotiated contracts provisions concerning "access-to-records". Furthermore, SmithKline concedes that it voluntarily executed the contracts at issue in this case with full knowledge of the access-to-records provisions contained in each contract. SmithKline argues, however, that it should not be required to disclose the information demanded by the GAO in this case because the record before the Court supports the conclusion that GAO is seeking the information for an improper purpose. This improper purpose, SmithKline contends, is that the GAO is seeking information concerning profits in the pharmaceutical industry for dissemination to Congress and the public. If the Court does not accept this contention and grant summary judgment for plaintiff, SmithKline then argues that summary judgment must be denied because the question of GAO's purpose constitutes a genuine issue of material fact. Finally, SmithKline argues that, even if this Court should conclude that GAO's purpose is proper, the information demanded in this case is beyond the scope of the access-to-records provisions of the contracts and the statutes. The government, on the other hand, argues that the provisions in the contracts and the statutes entitle the GAO to examine all records directly related to the costs of production of the drugs which the government has contracted to purchase. The government further argues that the uncontrovert-

ed factual record before the Court establishes that the purpose underlying its demand for records is proper.

Identical demands by GAO for the cost records of other drug companies have resulted in litigation in other circuits. In *Bristol Laboratories v. Staats,* 428 F.Supp. 1388 (S.D.N.Y.1977), the Court entered an order granting summary judgment for the plaintiff and requiring the production of only those documents the plaintiff agreed to provide, i. e., those related to direct manufacturing costs but not costs incurred in research and development, marketing and promotion, or distribution and administration. The Court in *Merck & Co. v. Staats,* No. 74–1447 (D.D.C.1977), adopted the order entered by the *Bristol* court. The Seventh Circuit has interpreted the access-to-records clauses to require broad access to cost records, including costs of research and development, whether or not pharmaceutical companies allocate such costs directly to the contracts. *Eli Lilly & Co. v. Staats,* 574 F.2d 904 (7th Cir.), *cert. denied,* 439 U.S. 959, 99 S.Ct. 362, 58 L.Ed.2d 351 (1978); *United States v. Abbott Labs,* 597 F.2d 672 (7th Cir. 1979). Hoffman-LaRoche, another drug company from which the GAO sought similar information, settled without litigation. *The Comptroller General's Authority to Examine the Private Business Records of Government Contractors,* 92 Harv.L.Rev. 1148, 1150 (1979). The delay in ruling on these cross-motions for summary judgment has been due, to considerable extent, to the agreement of the parties to await the outcome of litigation in other circuits.

■ We will deal first with SmithKline's contention that the question of the purpose for GAO's demand for records is a genuine issue of material fact. The standard for granting a motion for summary judgment is well established. *See Hicks v. Abt Assoc., Inc., supra* 572 F.2d at 967. We are mindful of our responsibility to resolve in favor of the non-moving party any doubt concerning whether there is a genuine issue of material fact. This court's examination of the depositions and affidavits submitted by the parties clearly shows that the government has met its burden of demonstrating that there are no genuine issues of material fact.

■ The government has submitted the deposition and affidavits, accompanied by voluminous exhibits, of Gregory J. Ahart, a senior GAO official. The only factual material that SmithKline has placed before the Court is the affidavit of Kenneth A. Bower, its Vice President for Administration and Finance. Mr. Bower's affidavit raises the issue of confidentiality, which has been resolved by the protective order agreed upon by the parties. The Bower affidavit also sets forth SmithKline's interpretation of the term "directly pertinent" as it is used in the access-to-records statutes. Mr. Bower's affidavit does not address the issue of the government's purpose for seeking SmithKline's records. Thus, the Ahart deposition and affidavits are uncontroverted in this regard. A party opposing summary judgment on the ground that there exists a genuine issue of material fact must respond to an affidavit with more than a general denial. *Lockhart v. Hoenstine,* 411 F.2d 455, 459 (3d Cir. 1969). The Court should not assume the existence of a factual issue where none exists. *Id.* In this case SmithKline attempts to characterize a legal issue as a factual one precluding summary judgment for the government. The question before the Court, however, is not "What was GAO's purpose in seeking information from SmithKline?". The uncontroverted factual record before the Court establishes that GAO's purpose is to compare cost to price of drugs purchased under specified contracts to determine the adequacy of the protections afforded the government in the contract negotiation process (Ahart Aff. I ¶ 11, discussed in detail, *infra* ). Whether or not this purpose is authorized by the access-to-records statutes is a question of law upon which summary judgment is clearly appropriate. *Evans v. S. S. Kresge Co.,* 394 F.Supp. 817 (W.D.Pa. 1975), *aff'd,* 544 F.2d 1184 (3d Cir. 1976), *cert. denied,* 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977).

SmithKline has agreed that "The relevant facts and issues here are identical to those in *Lilly* . . ." (Memorandum in Support of SmithKline's Cross-Motion for Summary Judgment), and has agreed to use discovery from previous cases. (*See* n. 5, *supra.*) Therefore, the denial of summary judgment in this already protracted and somewhat duplicative litigation would hardly further the policy of Rule 56 to "eliminate a trial in cases where it is unnecessary and would only cause delay and expense." *Anthony v. Ryder Truck Lines, Inc.,* No. 79–1539, Slip op. at 7, 611 F.2d 944 at 947 (3d Cir. 1979), *quoting Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir. 1976).

■ ' In determining whether the GAO's purpose in this case was authorized by the statutes, we must look to the source of the GAO's power to examine contractors' records. While the status of the GAO, as an agency of Congress, is not identical to that of administrative agencies of the executive branch, *see The Comptroller General's Authority to Examine the Private Business Records of Government Contractors,* 92 Harv.L.Rev. 1148 (1979), we find Professor Davis' principle of administrative law to be equally applicable to the issue of GAO's authority. That is, an agency's power to investigate can be exercised only for the purpose for which the authority was granted. 1 K. Davis, *Administrative Law* § 3.10. *See also Burlington Northern, Inc. v. Interstate Commerce Comm'n,* 149 U.S.App.D.C. 176, 462 F.2d 280 (D.C. Cir.), *cert. denied,* 409 U.S. 891, 93 S.Ct. 120, 34 L.Ed.2d 148 (1972); *Chattanooga Pharmaceutical Ass'n v. United States Dept. of Justice,* 358 F.2d 864 (6th Cir. 1966); *Shasta Minerals & Chemical Co. v. Securities & Exchange Comm'n,* 328 F.2d 285 (10th Cir. 1964); *Montship Lines, Ltd. v. Federal Maritime Board,* 111 U.S.App.D.C. 160, 295 F.2d 147 (D.C. Cir. 1961).

In determining for what purpose the GAO was granted authority to review business records of private businesses that contract with the government, we look first to the history of the access-to-records statutes.

Congress in 1951 amended the Armed Services Procurement Act of 1949 and the Federal Property and Administrative Services Act of 1949 to require the inclusion in government contracts that are "negotiated without advertising" of provisions authorizing the Comptroller to audit and examine materials "directly pertinent" to the contracts. The remarks of Representative Hardy, the sponsor of the amendment, make it clear that its purpose was to enable the GAO to determine whether suppliers of war materials under contracts let without competitive bidding were reaping excessive profits:

In normal times, competitive bidding generally operates as a brake on the price which a contractor can demand from the Government for his goods and services. However, these are not normal times, and it should be obvious to all of us concerned with the expenditure of billions of dollars for national defense that we must establish every reasonable safeguard against waste and extravagance in the spending of these vast sums. Under conditions as they now exist, competitive bidding has little or no effect upon contracts which are negotiated without advertising. As a result, when a contract is being negotiated, here is a typical illustration of what usually happens: A contractor with years of experience comes to the conference table accompanied by a highly competent accountant and an equally competent lawyer. The Government representative on the other side of the table will, in a great majority of cases, be at a tremendous disadvantage from the standpoint of both training and experience, no matter how conscientious and honest he may be. So, aside from any intentional liberality on the part of the Government contracting officer, there is every chance in the world that the Government will come out on the short end of the deal. The bill would at least enable the agent of the Congress to check the transaction both from the Government records and the contractors' books.

.     .     .     .

The major purposes of the bill are two-fold: One, to give the Comptroller General the proper tools to do the job the Congress has instructed him to do; and, two, to provide a deterrent to improprieties and wastefulness in the negotiation of contracts.

97 Cong.Rec. 13198 (October 15, 1951).

Before the current cases involving the pharmaceutical industry, there was only one judicial interpretation of the access-to-records provision of 10 U.S.C. § 2313(b), *Hewlett-Packard Company v. United States*, 385 F.2d 1013 (9th Cir. 1967). The Court there permitted the government to have access to production cost information, interpreting the statutory term "contract" broadly to include the general subject matter of the contract:

> In our opinion, however, the word "contract", as used in this statute is intended to have a broader meaning, embracing not only the specific terms and conditions of the agreement but also the general subject matter. The subject matter of these four contracts is the procurement of described property by the Government.
>
> Production costs directly pertain to that subject matter, because if out of line with the contract price, the contract may have been an inappropriate means of meeting this particular procurement need of the Government. While this appraisal could not affect these particular contracts, it could lead to the use of other methods of meeting future procurement needs. Production costs involve transactions relating to the contract, because they encompass business arrangements made by the contractor in obtaining the materials, labor, facilities and the like required by it in fulfilling its commitment with reference to the subject matter of the contract. *Id.*, at 1016.

We find that it is clear from the legislative history and from the interpretation of the *Hewlett-Packard* court that the

statutory access-to-records provisions permit GAO to examine cost records of negotiated contracts [7] in order to determine whether, as set forth in the legislative history, there have been "improprieties and wastefulness in the negotiation of contracts," or whether, as stated in *Hewlett-Packard*, the contractor's costs are "out of line with the contract price."

The uncontroverted factual record placed before the Court establishes that GAO seeks SmithKline's records for the cost-price comparison authorized by the statutes. The Court should look to the agency's own assertions of its reasons for seeking the information. *S.E.C. v. Chenery Corp.*, 322 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *see also C.A.B. v. United Airlines, Inc.*, 542 F.2d 395, 402 (7th Cir. 1976). While the circumstances leading up to GAO's demand for access to SmithKline's records might suggest that GAO was seeking to gather information for an industry study for the enlightenment of Congress and the public, GAO's statements demonstrate that its purpose was to review the pricing of drugs supplied under specific government contracts. The Comptroller General's letter to SmithKline, quoted at length at p. 8, above, refers to a "review of the procurement of drugs by agencies of the Federal Government, including the pricing of drugs and pharmaceuticals procured under negotiated contracts," and "information as may be necessary for use to review the reasonableness of the contract prices and the adequacy of the protection afforded the Government's interests." The uncontradicted affidavit of Gregory Ahart further establishes that GAO seeks access to SmithKline's records for the purpose of reviewing pricing of drugs purchased by the government. Mr. Ahart stated: "GAO intends to use data obtained through the access-to-records clause contained in the specified contracts in a proposed review to determine the basis for the prices charged by the suppliers of the products procured by the

---

7. Plaintiff argues that the access-to-records provisions do not apply to negotiated contracts when the price is based upon a catalog price, as it was in this case. We disagree. The provisions, by their terms, apply to negotiated contracts without qualification. Moreover, the contract price in *Hewlett-Packard* was based upon listed catalog prices. 385 F.2d at 1014.

Government under the specified contracts. . . ." (Ahart Aff. I ¶ 11). He further stated: "It is my opinion that the data . . . is necessary to review contract pricing by the Government's suppliers of drug items in order to determine the adequacy of the protection afforded the Government by the negotiation techniques used by the procuring agencies." (*Id.* ¶ 12). While the government has stipulated [8] that it suspects no impropriety in pricing in connection with the specific contracts, nothing in the access-to-records statutes suggests that the GAO must suspect impropriety before it exercises its authority to review a contractor's records. We therefore conclude that GAO's demand for SmithKline's cost records was made for a purpose authorized by the statutes. Thus, on the basis of the record before this Court, it is not necessary for us to determine, as did the Seventh Circuit in *Eli Lilly, supra* that an industry-wide public information study is an authorized purpose for a GAO inquiry. *See* 574 F.2d at 910–12.

Having determined that the undisputed facts in this record show that the GAO's purpose was authorized by the statutes, we must now determine the permissible scope of GAO's access to SmithKline's records.

The government argues that its right of access extends to records of all costs which in some way affected the price of the drugs purchased under the contracts which are at issue. Specifically, the government demands access to records of materials, labor, overhead, distribution, research and development, and marketing costs, whether or not SmithKline's accounting system apportions these costs to individual drug products or contracts. SmithKline argues that such broad access is not authorized by the statutes, nor was it within the contemplation of the parties at the time the contract was signed.

■■■■ The *Hewlett-Packard* case, *supra*, which held that the access-to-records statutes permitted the GAO to inspect all of a contractor's records of production costs of

the item purchased under the contract, was decided well before any of the contracts here at issue was signed. While *Hewlett-Packard* did not define the meaning of "production costs" directly pertinent to the contract, the Seventh Circuit in *Eli Lilly* made it clear that, under the access-to-records statutes, the government is not limited in its inspection to the direct costs of manufacturing the drug covered by the contract. Such a limitation, in the drug industry, would defeat the purpose of the access-to-records statutes since, as the Court in *Eli Lilly* pointed out, manufacturing and distribution costs of drugs have been estimated to constitute as little as nine percent of the product's sale price. *See* T. Donald Rucker, *Public Policy Considerations and the Pricing of Prescription Drugs in the United States,* 4 International Journal of Health Services, No. 1, 1974, pp. 173, 174. We agree with Eli Lilly's reasoning that "the access-to-records clauses should be interpreted so that an item is 'directly pertinent' to a contract if it is a significant input in the price of the product purchased in the contract." 574 F.2d at 914–915. This Court concludes therefore that the access-to-records statutes, and the contract clauses based thereon, clearly permit the GAO to inspect the records of costs of materials, labor, overhead, distribution, research and development, and marketing and such other costs as are directly pertinent to the drugs for which the government contracted. Interpreting the access-to-records statutes in light of their purpose to permit a determination as to whether costs are "out of line with the contract price," it is clear that the GAO is entitled to inspect the records of all costs which go into the makeup of the price of the drug covered in the contract.

The Court will therefore order Smith-Kline to permit the GAO to inspect records of costs of material, labor, overhead, distribution, research and development and marketing and such other costs as are directly pertinent to the drugs purchased under the

---

8. "GAO has no reason to believe that Smith-Kline made unreasonable or excessive profits with respect to the contracts which form the

subject matter of this action." (Stipulation of the parties filed March 14, 1977).

specified contracts. The Court will include in its Order provisions concerning the confidentiality of records, as agreed by the parties.

## ORDER

AND NOW, this 24th day of January, 1980, the Court, having considered the parties' cross-motions for summary judgment, having held a hearing thereon, for the reasons set forth in the Memorandum of this Court dated January 24, 1980, hereby ORDERS that plaintiff's motion for summary judgment is DENIED and defendant-intervenor's motion for summary judgment on its counterclaim is GRANTED as follows:

It is FURTHER ORDERED that the Comptroller General of the United States and his duly authorized representatives have the right to examine all books, documents, papers, or records directly relating to the pricing and cost of producing items furnished by plaintiff SmithKline under the following contracts numbered: V797P–5835(b), V797P–5892(b), DSA120–74–C–2519, DSA120–74–C–2518 and DSA 120–73–D–2968, including, but not limited to, records of experienced costs, including costs of materials, labor, overhead, distribution, research and development, and marketing, and such other costs as are directly pertinent to the drugs covered in the enumerated contracts;

It is FURTHER ORDERED that the plaintiff, SmithKline, its officers, agent, servants, attorneys, employees and all persons in active concert or participation with them who receive actual notice of an order by personal service or otherwise, are enjoined from preventing the duly authorized representatives of the Comptroller General of the United States from obtaining access to and examining such books, documents, papers, or records of the plaintiff that this Court has ordered the Comptroller General and his duly authorized representatives have the right to examine; and plaintiff SmithKline, including its officers and subordinates, are directed to have available on the premises of SmithKline, and its other principal offices wherever located, such

books and records upon reasonable notice by the Comptroller General or his authorized representatives;

It is FURTHER ORDERED that every book, report, papers, record, and other document (all hereinafter referred to as "document"), designated as confidential by SmithKline or any of its divisions or subsidiaries and provided or otherwise made available to the Comptroller General or any of his successors, agents, employees, or subordinates (all hereinafter referred to as "the Comptroller General"), and every summary thereof and extract therefrom, and all data and information contained therein, including accountants' work papers (all hereinafter referred to as "data"), shall be held in confidence and shall not be provided or otherwise made available by the Comptroller General to any person or agency outside the General Accounting Office except as provided in subparagraphs (a), (b), and (c), below. No copies of SmithKline's documents shall be included in accountants' work papers without the approval of SmithKline.

Any document and data referred to in the above paragraph shall be used by the Comptroller General solely for the purpose of a contract study. Upon completion of that study, the Comptroller General shall immediately return to SmithKline all documents described in that paragraph. Any data in which SmithKline, any of its divisions or subsidiaries, or any product manufactured or sold by any of them are or may be directly or indirectly identified which the Comptroller General deems it necessary to retain shall be retained by the General Accounting Office and deposited with and maintained by the Comptroller General under security measures to be agreed upon by the parties. Access to such data by any person shall be permitted only upon written authorization of the Comptroller General, and as limited in the subparagraphs following next denominated a, b, and c.

(a) Any of the data referred to in the above paragraphs may be published, provided to, or otherwise made available to a person or agency outside the General

Accounting Office if the data are published, provided, or made available in such a way that any direct or indirect identification of SmithKline, any of its divisions or subsidiaries, or any product manufactured or sold by any of them, is not reasonably possible. SmithKline shall be afforded a reasonable opportunity to examine and offer its comments regarding any data considered for release, including any report issued by the Comptroller General that includes such data, before release of the data or report.

(b) The Comptroller General may comply without regard to the limitations of this Order set forth above, with an official written request for any of the data referred to above submitted to him by either House of Congress, or any committee of the House of Representatives or the Senate, or any joint committee of the two Houses, having jurisdiction over the subject matter of the study referred to in the Affidavit of Gregory J. Ahart filed in this action, to the extent authorized and directed by law. The Comptroller General will cause prompt notice of any such request to be given to SmithKline and to this Court at least seven (7) calendar days prior to furnishing the data requested.

(c) The Comptroller General and the United States shall notify SmithKline promptly of any request for disclosure, subpoena *duces tecum*, civil action, or other order or application for an order seeking production, release, or disclosure of any data referred to above, and further agree to use their best efforts to protect the confidentiality of such data, except as provided above, including resort to appropriate judicial remedies and cooperation with SmithKline in such efforts.