**HEWLETT–PACKARD COMPANY, a corporation, David Packard, and Wilfred F. Cavier, Appellants,**

v.

**UNITED STATES of America, Appellee.**

No. 21323.

United States Court of Appeals Ninth Circuit.

Nov. 15, 1967.

McCutchen, Doyle, Brown, Trautman & Enersen, Robert Minge Brown (argued), San Francisco, Cal., for appellant.

Cecil F. Poole, U. S. Atty., San Francisco, Cal., Barefoot Sanders, Asst. Atty. Gen., Harland F. Leathers (argued), Atty. Civil Division, Dept. of Justice, Washington, D. C., for appellee.

Before CHAMBERS, HAMLEY and HAMLIN, Circuit Judges.

HAMLEY, Circuit Judge:

The United States brought this action against Hewlett-Packard Company, a corporation, to enforce the Government's asserted right under 10 U.S.C. § 2313(b) (1964) to examine certain books and records of the company.[1] Plaintiff sought declaratory and injunctive relief. After defendants filed a responsive pleading the parties stipulated as to the relevant facts and filed cross motions for summary judgment. The district court granted the motion of the United States, denied that of Hewlett-Packard, and entered a judgment substantially as prayed

---

1. David Packard and Wilfred F. Cavier, President and Vice-President-Finance of Hewlett-Packard, respectively, were al-

so named defendants, but it will not be necessary to make further reference to them in this opinion.

for in the complaint. Hewlett-Packard appeals.

Hewlett-Packard is a manufacturer of electronic test and measurement equipment designed for general use where great precision in measurement is required. During the period from March, 1959 to January, 1961, the United States Department of the Air Force awarded to Hewlett-Packard four negotiated firm fixed-price contracts for equipment. The parties are agreed that, for the purposes of this case, the two contracts referred to below may be regarded as typical.

One of these, designated No. AF 33 (604) 22221, was executed on March 16, 1959. It provided for the sale, to the United States, of standard commercial items of equipment then sold by Hewlett-Packard in substantial quantities to the general public. With one exception, each such item had been included in Hewlett-Packard's regularly published catalog for the previous three years or more. The catalog listed items for sale to the public at indicated prices. Each item qualified as a standard commercial article as defined by the Renegotiation Act of 1951, 65 Stat. 7, added by 70 Stat. 790 (1956), 50 U.S.C.App. § 1216(e) (1964), and was therefore exempt from renegotiation.[2]

In the contract of March 16, 1959, the contract price was determined upon the basis of the listed catalog prices of the particular item of equipment, less a volume discount. The Government's Request for Proposal which was incorporated into the contract contained a form statement of additional terms and conditions, but only the clauses checked by the Government were to be applicable. One

clause, entitled "Cost Data Information," called for the seller to provide the Government with detailed data concerning such cost items as material, labor and overhead. However, this clause was not checked and was therefore not applicable. Hewlett-Packard did not supply to the Government any information as to the costs of production or profit margins upon any of the items listed in this contract.

The other contract which the parties regarded as typical, designated No. AF 33(604)–31882, was executed on January 30, 1961. This contract related to only one item of equipment, namely Hewlett-Packard instrument Model No. 620A. This was a standard commercial item then sold by the company in substantial quantities to the general public. The item had been included in Hewlett-Packard's regularly published catalog since 1952, for sale to the public at a catalog list price. The price had remained unchanged since the original date of introduction of the item.

At the date of execution of this contract, this item of equipment qualified as a standard commercial article as defined by the Renegotiation Act of 1951, as amended, and was therefore exempt from negotiation. The contract price was determined upon the basis of the listed catalog price, less a volume discount. Hewlett-Packard did not supply to the Government any information as to any of the company's costs of production or profit margins upon this contract item.[3]

All four contracts were negotiated pursuant to chapter 137, Title 10, U.S.C. §§

---

2. Under this section the provisions of the Renegotiation Act were made mandatorily inapplicable to amounts received or accrued in a fiscal year under any contract or subcontract for a standard commercial article. In Senate Report 643, July 25, 1953, U.S. Code Cong. & Admin. News (1954), p. 3880, the committee gave the following reasons for making this exemption mandatory rather than permissive:

"The committee believes that in the case of standard commercial articles there is in most cases no basis or need

for renegotiation since cost and pricing experience has already been acquired and prices made in a competitive market."

3. In a memorandum dated January 4, 1961, prepared by employees of the Air Force, setting forth facts as to the negotiation of this contract, the following statement was made:

"2. The Field Analyst was not contacted to evaluate subject proposal due to urgency (AOCP) of this proposal and the fact that competition was in-

2301–2314, entitled "Procurement Generally." A subsection of that chapter, 10 U.S.C. § 2313(b), provides that each contract negotiated under chapter 137 shall provide that the Comptroller General and his representatives are entitled for a period of three years after final payment, to examine any books, documents, papers or records of the contractor, or any of his subcontractors:

> "that directly pertain to, and involve transactions relating to, the contract or subcontract."

Consistent with this statutory provision each of the four contracts referred to above contained a clause 10, giving the Comptroller General and his representatives for a period of three years after final payment, access to and the right to examine:

> "any directly pertinent books, documents, papers, and records of the Contractor involving transactions related to this contract." [4]

Purporting to exercise rights accorded by clause 10 of these contracts, representatives of the Comptroller General commenced an examination of the books and records of Hewlett-Packard in September, 1962. During this examination the company permitted access to books and records relating to sales prices of various instruments and parts sold under the four contracts. The representatives of the Comptroller General then requested all books, documents, papers or records of Hewlett-Packard:

> "relating to the pricing and cost of performance, support for prices charged to the Government, and such other necessary information which would permit

such Representatives to review the reasonableness of the contract prices provided for in the aforesaid contracts."

This request was refused by Hewlett-Packard upon the ground that cost of production information was not directly pertinent to these contracts. In this suit, which the United States then instituted, the trial court disagreed with Hewlett-Packard, and judicially declared that the company's costs of direct material, direct labor and overhead costs in producing the items furnished under the contracts, directly pertain to, and involve transactions relating to, those contracts. The court further declared that the Comptroller General and his representatives have the right to examine the books, documents, papers and records of the company relating to or ·otherwise disclosing these production costs. Defendants were ordered to make this information available to the Government.[5]

Hewlett-Packard argues that the decision of the district court gave no effect to the words of limitation contained in 10 U.S.C. § 2313(b), and reflected in clause 10 of each contract.

The words of limitation to which the company refers limit the records which may be examined by the Comptroller General and his representatives to those "of the contractor, or of any of his subcontractors, *that directly pertain to, and involve transactions relating to, the contract or subcontract.*" (Emphasis supplied.) Hewlett-Packard asserts that the district court has, in effect, placed a period after the word "subcontractors" in the quoted clause, and has thus given no practical effect to the words of limitation.

---

volved. In addition, subject item is listed in contractor's catalogue."

An agency regulation pertaining to firm fixed-price contracts, and an agency statement of contract pricing policy, appear to recognize that production costs need not be inquired into in connection with the purchase of items having an established catalog or market price. (32 C.F.R. § 3.403.1 (1955), now 32 C.F.R. § 3.404.2 (1964), Defense Procurement Circular No. 5, May 12, 1964.)

4. The parties seem to be agreed that clause 10 in the four contracts in question was intended to give the Comptroller General the same rights of examination as specified in section 2313(b).

5. The trial court stayed the injunctive provisions of the judgment pending disposition of this appeal.

A mere reading of the judgment indicates that this is an overstatement. If, in its decree, the district court had placed a period after the word "subcontractors," then the Comptroller General and his representatives would have been authorized to examine the books of the company without limitation. Instead, the court declared that the Comptroller could examine any such records

> "relating to the cost of producing the items furnished by Hewlett-Packard Company under the aforesaid contracts, including costs of direct material, direct labor and overhead costs. * * * "

It is therefore clear that the district court sought to give effect to the words of limitation. The question is whether it gave full effect to those words. This depends upon the meaning to be attached to those words.

The key word in the limitation clause is "contract." If that word is used in section 2313(b) only with reference to the terms and conditions of an agreement and the procedures whereby those terms and conditions were formulated, then the district court failed to give full effect to the limitation clause. As Hewlett-Packard correctly points out, under the stipulated facts summarized above, production costs were not taken into consideration in arriving at the terms and conditions of the contracts in question. Thus data pertaining to production costs could not be said to directly pertain to, and involve transactions relating to, the contract, as so defined.

In our opinion, however, the word "contract," as used in this statute is intended to have a broader meaning, embracing not only the specific terms and conditions of the agreement, but also the general subject matter. The subject matter of these four contracts is the procurement of described property by the Government.

Production costs directly pertain to that subject matter, because if out of line with the contract price, the contract may have been an inappropriate means of meeting this particular procurement need of the Government. While this appraisal could not affect these particular contracts, it could lead to the use of other methods of meeting future procurement needs. Production costs involve transactions relating to the contract, because they encompass business arrangements made by the contractor in obtaining the materials, labor, facilities and the like required by it in fulfilling its commitment with reference to the subject matter of the contract.

Hewlett-Packard contends, in effect, that the sole purpose of the examination right accorded by section 2313(b) and clause 10 of these contracts, is to enable the Comptroller General to find out whether the particular contracts which give rise to the examination had been performed in accordance with their terms and whether the contracting officer had been defrauded or misled in entering into the contract.

We find nothing in the words of the statute, its legislative history, or administrative interpretation, or in the impact of other statutes, which supports this view. On the contrary, it seems to us that if such a limited scope of examination had been intended by Congress it would have found the means to so indicate. The term "contract" could have been given a restricted meaning, or the scope of the permissible examination could have been specifically limited to lines of inquiry relevant to the legality and faithful performance of the particular contract giving rise to the examination.

Affirmed.